AARON MOTWANI                                    CIVIL ACTION

VERSUS                                           NO. 17-2060

WET WILLIES MANAGEMENT CORP.                     SECTION "B"(5)

## ORDER AND REASONS

Before the Court is "Defendant Wet Willie's Management Corp.'s Motion to Dismiss Claims IV, V & VI of the First Amended Complaint." Rec. Doc. 12. Plaintiff timely filed an opposition memorandum. Rec. Doc. 16. Defendant then requested, and was granted, leave to file a reply memorandum. Rec. Doc. 24. For the reasons outlined below,

**IT IS ORDERED** that the motion to dismiss (Rec. Doc. 12) is **DENIED**.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of Aaron Motwani's ("Plaintiff") operation of six restaurants known as "WILLIE'S CHICKEN SHACK." Rec. Doc. 1 at ¶¶ 13-15. He alleges that he owns the common law marks "WILLIE'S CHICKEN SHACK" (the word mark) and "WILLIE'S CHICKEN SHACK DAIQUIRIS COLD BEER" (the design mark). *Id.* at ¶¶ 17-19. On July 22, 2016, he filed two federal applications to register these marks and these applications are currently pending in the United States Patent and Trademark Office ("USPTO"). *Id.* at ¶¶ 21-23. Examining Attorney Matthew C. Kline searched for prior

registrations containing similar terms and, on November 2, 2016, stated that he had "found no conflicting marks that would bar registration" of either mark. *Id.* at ¶¶ 28, 30-31, 36. On December 7, 2016, after determining that the marks were distinctive and not likely to be confused with any pre-existing registration, the USPTO issued notices of publication as to both marks, recognizing that they appeared to be entitled to registration. *Id.* at ¶¶ 32-35, 38-40. On December 27, 2016, Plaintiff's applications were published in the Trademark Official Gazette. *Id.* at ¶ 41.

Wet Willie's Management Corp. ("Defendant") previously registered several marks, including "WET WILLIE'S A BAR A PARTY AN INSTITUTION" (Defendant's design mark), "WEAK WILLIE" (Defendant's word mark for a frozen non-alcoholic daiquiri-flavored drink), "WET WILLIE'S" (Defendant's word mark), "NAKED WILLIE" (Defendant's word mark for a frozen alcoholic daiquiri drink). Rec. Doc. 1 at ¶¶ 42-46. Defendant "is in the business of licensing these marks to franchisees for use in connection with operating daiquiri shops throughout the United States." *Id.* at ¶ 48.

On January 27, 2017, Plaintiff's counsel received a demand letter from Defendant's counsel accusing Plaintiff of infringing on Defendant's marks by using the terms "WILLIE" and "WILLIE'S" in connection with restaurants that specialize in frozen daiquiris. Rec. Doc. 1 at ¶¶ 49-50. Defendant insisted that Plaintiff file an express abandonment of the marks, cease and desist from further

use of the marks, cancel any corporate name registrations, abandon any domain name registrations, and execute a written agreement not to use or register any similar trademarks, corporate names, or domain names. *Id.* at ¶¶ 74-79. Defendant also filed a notice of opposition with the USPTO to the registration of Plaintiff's marks, arguing that the marks are likely to lead to confusion or otherwise dilute its marks pursuant to 15 U.S.C. §§ 1052(d), 1125(c). *Id.* at ¶¶ 54-58.

Consequently, on March 10, 2017, Plaintiff filed the instant suit pursuant to the Declaratory Judgment Act (28 U.S.C. §§ 2201(a), 2202) seeking a declaratory judgment of trademark non-infringement, non-dilution, and unenforceability under the federal Lanham Act (15 U.S.C. § 1051). Rec. Doc. 1 at ¶ 1. Plaintiff alleges that the term "WILLIE'S" is commonly used in connection with the operation of bars and/or restaurants and that the USPTO nevertheless registers the use of marks containing the terms "WILLIE," "WILLY," and/or "WILLEY." *Id.* at ¶¶ 59-60. He further argues that his marks are sufficiently dissimilar from Defendant's marks and that the services provided under these marks are not likely to cause confusion. *Id.* at ¶¶ 65-68. Finally, Plaintiff alleges that Defendant's marks are not famous, such that Plaintiff's marks cannot "dilute" them. *Id.* at ¶¶ 69-70. Based on these allegations, Plaintiff asserted that he is entitled to a declaratory judgment of (1) trademark non-infringement under 15

U.S.C. § 1114 (Rec. Docs. 1 at ¶¶ 89-93; 7 at ¶¶ 132-36) and (2) non-dilution under 15 U.S.C. § 1125(c) (Rec. Docs. 1 at ¶¶ 94-98; 7 at ¶¶ 137-41).

On May 10, 2017, Plaintiff filed an amended complaint to add claims for a permanent injunction and damages in accordance with Federal Rule of Civil Procedure 15(a)(1)(A). Rec. Doc. 7 at 1.[1] He specifically alleged that the demand letter "effectively demanded Plaintiff cease the development and operation of his . . . restaurants throughout New Orleans, Louisiana, that specialize in the service of fried chicken and include a full-service bar" and that these demands were made in bad faith to discourage competition as Defendant attempts to enter the New Orleans market. *Id.* at ¶¶ 95, 97-105. Due to Defendant's opposition, Plaintiff claims that he has suffered anti-competitive harm, as evidenced by an email in which an unknown party states that they cannot move forward with franchising opportunities until the trademark dispute is resolved. *Id.* at ¶¶ 108-28. Based on these allegations, Plaintiff added the following claims in his amended complaint: (3) a declaratory judgment of non-violation of unfair competition statutes, including 15 U.S.C. § 1125(a) (*id.* at ¶¶ 142-46); (4) an

---

[1] The amended complaint also notes that (1) a "PINEAPPLE WILLY'S" mark was approved by the USPTO on March 21, 2017, after Plaintiff applied for registration of his marks, (2) Defendant never opposed the registration of that mark, and (3) that mark used "an equivalent of 'WILLIE'S' and is also used in connection with restaurant services, including the service of daiquiris." Rec. Doc. 7 at ¶ 73.

injunction, damages, attorney fees, and costs to address
Defendant's anti-competition actions under the Sherman Act, 15
U.S.C. § 2, and Clayton Act, 15 U.S.C. § 15 (*id.* at ¶¶ 147-51);
(5) an injunction, damages, attorney fees, and costs to address
Defendant's unfair competition actions under the Louisiana Unfair
Trade Practices Act ("LUTPA"), LA. REV. STAT. ANN. § 51:1405 (*id.* at
¶¶ 152-56); and (6) an injunction, damages, attorney fees, and
costs to address Defendant's negligent interference under
Louisiana law, LA. CIV. CODE art. 2315 (*id.* at ¶¶ 157-60).

## II. THE PARTIES' CONTENTIONS

Defendant filed the instant motion pursuant to Federal Rule
of Civil Procedure 12(b)(6) to dismiss claims 4-6, Plaintiff's
Sherman Act, LUTPA, and negligent interference claims. Rec. Doc.
12 at 1. It specifically argues that these claims are barred by
the *Noerr-Pennington* doctrine and that Louisiana does not
recognize negligent interference claims. Rec. Doc. 12-1 at 2.

Plaintiff responds that its claims are subject to the "sham"
exception to the *Noerr-Pennington* doctrine, based on facts
explicitly detailed in the amended complaint, and that the
Louisiana Supreme Court does not bar, per se, claims for negligent
interference. Rec. Doc. 16-1 at 2, 4.

## III. LAW AND ANALYSIS

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure,
a party can move to dismiss a complaint for failure to state a

claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Such motions are viewed with disfavor and rarely granted. *Lowrey v. Tex. A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir. 1997) (quoting *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir. 1982)). Nonetheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, when reviewing a motion to dismiss, courts must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party. *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).

## A. THE *NOERR-PENNINGTON* DOCTRINE

The *Noerr-Pennington* doctrine provides "that parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988) (citing *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of*

6

*Am. v. Pennington*, 381 U.S. 657 (1965)). Accordingly, "'petitions' made to the executive or judicial branches of government, e.g., in the form of administrative or legal proceedings, are exempt from antitrust liability even though the parties seek ultimately to destroy their competitors through these actions." *Id.* Pre-suit threats to litigate, such as cease-and-desist letters, made in good faith are similarly exempt. *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983) ("it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute") (footnote and citations omitted); *Constr. Cost Data, LLC v. Gordian Grp., Inc.*, No. 16-114, 2017 WL 2266993, at *4 (S.D. Tex. Apr. 24, 2017), *report and recommendation adopted,* 2017 WL 2271491 (S.D. Tex. May 22, 2017) (citations omitted); *Wolf v. Cowgirl Tuff Co.*, No. 15-1195, 2016 WL 4597638, at *7 (W.D. Tex. Sept. 2, 2016); *Indus. Models, Inc. v. SNF, Inc.*, No. 15-689, 2015 WL 5606384, at *2 (N.D. Tex. Sept. 23, 2015); *Source Network Sales & Mktg., LLC v. Ningbo Desa Elec. Mfg. Co.*, No. 14-1108, 2015 WL 2341063, at *8 (N.D. Tex. May 15, 2015); *Credit Counseling Ctrs. of Am. v. Nat'l Found. for Consumer Credit, Inc.*, No. 94-1855, 1997 WL 160180, at *4 (N.D. Tex. Apr. 1, 1997).

"Although the *Noerr-Pennington* doctrine initially arose in the antitrust field," this Circuit has "expanded it to protect [F]irst [A]mendment petitioning of the government from claims brought under federal and state laws, including section 1983 and common-law tortious interference with contractual relations." *Video Int'l*, 858 F.2d at 1084 (citations omitted) (holding that the doctrine extends to protect petitioning from claims brought under state law, particularly a claim for common law tortious interference with contractual relations).

However, the doctrine does not bar liability where the petitioning activity is a "sham." *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 690 (5th Cir. 2010) (citations omitted). This is because "'application of the Sherman Act would be justified' when petitioning activity, 'ostensibly directed toward influencing governmental action, is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) (quoting *Noerr*, 365 U.S. at 144). The Supreme Court created a two-part test for sham litigation:

> (1) "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) "only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation" to determine "whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business

relationships of a competitor,' through the 'use [of] the governmental *process* as opposed to the *outcome*.'"

*Bryant*, 597 F.3d at 690 (quoting *Prof'l Real Estate Inv'rs*, 508 U.S. at 60-61) (emphasis in original). "The plaintiff bears the burden to disprove the challenged lawsuit's legal viability before subjective intent can be considered." *Id.* at 690-92 (citing *Prof'l Real Estate Inv'rs*, 508 U.S. at 60-61).[2]

Here, Defendant argues that Plaintiff's claims under the Sherman Act, LUTPA, and for negligent interference arise from Defendant's filing of the opposition ("which is an administrative proceeding in which [Defendant] is seeking relief from the government—namely, the denial of [Plaintiff's] trademark applications") and mailing of the demand letter, and are accordingly barred under the *Noerr-Pennington* doctrine. Rec. Doc. 12-1 at 7. Defendant further argues that the opposition and demand letter are not subject to the sham exception to the doctrine, because the claims contained therein were not "objectively baseless." *Id.* at 8. Defendant insists that it based its claims in those documents on federally-registered trademark rights, such that "it cannot be said that 'no reasonable litigant could realistically expect success on the merits.'" *Id.* (citing *RJ Mach.*

---

[2] "Of course, even a plaintiff who defeats the defendant's claim to *Noerr* immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim." *Prof'l Real Estate Inv'rs*, 508 U.S. at 61.

*Co. v. Can. Pipeline Accessories Co.*, No. 13-579, 2013 WL 8115445, at *4 (W.D. Tex. Nov. 22, 2013)).

In response, Plaintiff notes that his amended complaint specifically alleged that Defendant's opposition and allegations in the demand letter were "groundless" and that Defendant's actions went "well-beyond any reasonable interpretation of the scope of its actual rights." Rec. Doc. 7 at ¶¶ 86-88. He also alleged that his use of the marks did not infringe on or dilute Defendant's registrations. *Id.* at ¶¶ 80, 83.

Plaintiff specifically cited to various factual allegations in the amended complaint that he believes significant. In turn, Defendant responded to each.

First, the amended complaint recognized each of Defendant's registered marks, none of which incorporate the entirety of "WILLIE'S CHICKEN SHACK." Rec. Doc. 7 at ¶¶ 53-58. Defendant argues that the fact that it does not hold a registration to a "WILLIE'S CHICKEN SHACK" mark "does not render its trademark claims objectively baseless as is required to invoke *Noerr-Pennington*'s 'sham' exception." Rec. Doc. 24 at 3 (citing Thomas J. McCarthy, *McCarthy on Trademark and Unfair Competition* (4th Ed.), §§ 23.20, 23.20.50 ("It is certainly not necessary to use an exact copy of another's mark for a reasonable buyer to be likely to be confused" and "[w]here the goods and services are directly competitive, the

degree of similarity required to prove a likelihood of confusion is less than in the case of dissimilar products")).

Second, Plaintiff noted that the USPTO's examining attorney found no conflicting marks that would bar registration and concluded that Plaintiff's marks appear to be entitled to registration. Rec. Doc. 7 at ¶¶ 30-37, 44-51. Defendant argues that the examining attorney's findings are not dispositive, especially in light of the fact that the USPTO allows oppositions to be filed to contest such findings. Rec. Doc. 24 at 3 (citing McCarthy, § 20.2 ("it is not dispositive or even relevant in an opposition proceeding that [the] applicant was able to convince the Trademark Examining Attorney during ex parte examination that the mark was registerable and to pass the application to publication").

Third, Plaintiff pleaded that the term "WILLIE'S" is common in the industry, documented various registrations containing the term "WILLIE" or similar terms, and otherwise noted that Defendant did not question the March 21, 2017 registration of the mark "PINEAPPLE WILLY'S," which is used in connection with the service of daiquiris. Rec. Doc. 7 at ¶ 71-73. Defendant notes that consideration of "the number and nature of similar marks in use on similar goods" is only the sixth of thirteen *DuPont* factors that the USPTO and courts should consider and that "[w]hile these third-party registrations may have some bearing on the relative strength

or weakness of Defendant's . . . marks, this would be but one factor considered in an infringement analysis . . . ." Rec. Doc. 24 at 4-5 (citing *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *Application of E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973))).

Fourth, Plaintiff alleged that the services provided under Defendant's marks, namely the service of daiquiris, is not unique and therefore that Defendant's registrations are limited in scope. Rec. Doc. 7 at ¶¶ 74-76. Defendant argues that under the second *DuPont* factor, which considers the similarity and nature of the services provided under the competing marks, the fact that both Plaintiff and Defendant offer restaurant and bar services (including in particular the service of daiquiris) . . . weighs in favor of Defendant's claims and in no way supports a position that Defendant's claims are objectively baseless." Rec. Doc. 24 at 5 (citing *DuPont*, 476 F.2d at 1361; *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 877 (Fed. Cir. 1992) ("When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines")).

Finally, Plaintiff alleged that Defendant's marks were sufficiently dissimilar to avoid consumer confusion, Plaintiff's use of his marks would not damage Defendant, and Defendant's marks

12

are not famous and therefore not entitled to the dilution protections under the Lanham Act. Rec. Doc. 7 at ¶ 77-79, 82, 84. Defendant maintains that these are conclusory allegations unsupported by fact. Rec. Doc. 24 at 6 (citing *Yeti Coolers, LLC v. Rtic Coolers, LLC*, No. 15-597, 2016 WL 5956081, at *4 (W.D. Tex. Aug. 1, 2016); *ERBE Electromedizin GmbH v. Canady Tech. LLC*, 529 F. Supp. 2d 577, 595 (W.D. Pa. 2007); *aff'd sub nom.*, 629 F.3d 1278 (Fed. Cir. 2010)).

At this stage, Plaintiff only needs to allege facts that plausibly entitle him to relief. First, at the very least, the Court requires more information as to the similarity of the services provided under the marks to determine whether or not Defendant's allegations were objectively baseless and/or whether or not Plaintiff has proved the "sham" exception. Second, there is a dispute as to the weight to be given to the examining attorney's findings. At the motion to dismiss stage, all well-pleaded facts must be read in the light most favorable to the non-moving party, in this case Plaintiff. *Baker*, 75 F.3d at 196. Third, even if the use of similar marks is but one factor for the Court to consider, the evidence produced by Plaintiff regarding the use of similar marks by other entities indicates that Defendant's allegations against Plaintiff, alone, may have been objectively baseless. At this early stage, the evidence at least indicates that this factor does not weigh in the moving party's favor. Fourth, the fact that

both parties provide similar services, namely the service of daiquiris, may ultimately weigh in Defendant's favor; again, though, the facts must be viewed in the light most favorable to Plaintiff and Plaintiff has alleged that this service is not unique and therefore that Defendant's marks are inherently limited. Finally, Plaintiff has sufficiently alleged that the marks are dissimilar and would not lead to confusion. Even though Defendant argues that these are conclusions unsupported by fact, Plaintiff has provided various factual allegations, including a description of the marks at issue, and these facts could allow the Court to draw the "reasonable inference" that the marks are not likely to cause confusion. In other words, the facts, accepted as true, could plausibly lead to the conclusion that Defendant filed its opposition and mailed the demand letter, even though its allegations were objectively baseless, with the intention of inconveniencing Plaintiff and interfering with his business relationships. This issue, if appropriate for pretrial disposition at all, is certainly better decided at the motion for summary judgment stage. Even one of the cases relied on by Defendant, *ERBE*, was decided on a motion for summary judgment, not a motion to dismiss under 12(b)(6).

Turning to the second prong of the sham exception, Defendant argues that "[t]hough [Plaintiff] attempts to paint a picture of [Defendant's] actions being solely intended to reduce competition

in the daiquiri market in New Orleans to clear the way for its own potential franchisee, [Plaintiff] fails to mention that he is using the WET WILLIE'S mark in full in the form of the name of his signature drink, the WILLIE'S WET WILLY." Rec. Doc. 12-1 at 9.

In response, Plaintiff notes that he specifically alleged in the amended complaint that Defendant's opposition and demand letter "were brought in bad faith" and that "Defendant lacks any legitimate basis whatever, in fact or law, to assert" the claims made in the opposition and demand letter, demonstrating an intent to misuse its trademark . . . rights to prohibit" the use and registration of Plaintiff's marks and the development and operation of the restaurants that use them. Rec. Doc. 7 at ¶ 97. The amended complaint further provided that "Defendant's said course of action against Plaintiff is without regard to the outcome . . . ." *Id.* at ¶ 98. Plaintiff also argues that his alleged use of "WILLIE'S WET WILLY" is irrelevant to Defendant's opposition to the registration of Plaintiff's "WILLIE'S CHICKEN SHACK" and "WILLIE'S CHICKEN SHACK DAIQUIRIS COLD BEER" marks because Plaintiff is not attempting to register a "WILLIE'S WET WILLY" mark. Rec. Doc. 16-1 at 16. According to Plaintiff, "[e]ither Defendant aims to confuse the issue, or its . . . opposition is a pretext to redress . . . an allegation of infringement [as to the "WILLIE'S WET WILLY" mark], which is not the proper forum to address such infringement allegations." *Id.* at 16-17.

Defendant responds that Plaintiff's use of "WILLIE'S WET WILLY" is relevant to the analysis of whether or not Plaintiff's marks are likely to cause confusion and therefore suggests that Defendant has a genuine interest in the outcome of its opposition. Rec. Doc. 24 at 7-8 (citing *Loreal S.A. & Loreal USA, Inc.*, 102 U.S.P.Q.2d 1434, 2012 WL 1267956, at *10 (T.T.A.B. Mar. 20, 2012) (where the applicant repeatedly filed applications to register well-known marks, the court was convinced that the applicant's adoption of the mark at issue was in bad faith and intended to trade off of the opposer's famous marks; "[s]uch bad faith is strong evidence that confusion is likely, as such an inference is drawn from the imitator's expectation of confusion")).

Again, Plaintiff pleaded sufficient factual content, accepted as true and viewed in the light most favorable to him, to allow the Court to draw the reasonable inference that Defendant merely intended to interfere with Plaintiff's business and was uninterested in the outcome of its opposition and demand letter.

### B. NEGLIGENT INTERFERENCE WITH CONTRACTUAL RELATIONS

The parties dispute whether or not Louisiana law bars, per se, negligent interference with contract claims or if the Louisiana Supreme Court has refused to recognize such claims only after conducting a duty/risk analysis. The Louisiana Supreme Court appeared to recognize in 1984 that such claims are not necessarily barred per se, but instead must first be considered under

Louisiana's duty/risk framework. *PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058, 1060 (La. 1984). Yet, various lower courts have subsequently found that "Louisiana does not recognize a cause of action for negligent interference with contract rights." *Carter v. Smith*, 607 So. 2d 6, 7 (La. App. 2 Cir. 1992) (citing *Great Sw. Fire Ins. Co. v. CNA Ins. Cos.*, 557 So. 2d 966 (La. 1990); *9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 229 (La. 1989)); *see also, e.g., Brown v. Romero*, 05-1016, p. 6 (La. App. 3 Cir. 2/1/06); 922 So. 2d 742, 747, *writ denied,* 06-0480 (La. 5/5/06); 927 So. 2d 315 ("the supreme court has expressly declined to recognize a cause of action for negligent interference with contract") (citing *Great Sw. Fire Ins.*, 557 So. 2d 966); *Inka's S'Coolwear, Inc. v. Sch. Time, L.L.C.*, 97-2271 (La. App. 1 Cir. 11/6/98); 725 So. 2d 496, 502 (citing *9 to 5*, 538 So. 2d at 232).

These lower courts primarily rely on two Louisiana Supreme Court cases (from 1989 and 1990). These cases, and a more recent Fifth Circuit case (from 2011), are briefly summarized below.

In *9 to 5*, the Louisiana World Exposition, Inc. ("LWE") contracted with 9 to 5 Fashions ("9 to 5") to supply uniforms for the 1984 Louisiana World's Fair. 538 So. 2d at 230 (La. 1989). The trial court found that LWE's chief executive officer caused 9 to 5 damage by failing to appoint a uniform coordinator until three months before the fair. *Id.* The court of appeal reduced the ultimate damage award, but otherwise affirmed, reasoning that the

17

CEO breached his duty of care. *Id.* The Louisiana Supreme Court recognized the action as one for tortious interference with a contractual relationship. *Id.* at 231. It noted that, in Louisiana, "every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." *Id.* (citing LA. CIV. CODE art. 2315). Nonetheless, "[i]nterference with contract . . . has remained almost entirely an intentional tort; and, in general, liability has not been extended to the various forms of negligence by which performance of a contract may be prevented or rendered more burdensome." *Id.* at 232. In addition to the fact that negligent interference with contract is not generally recognized, "there are strong reasons that corporate officers should enjoy immunity from liability for negligent contractual interference [and] . . . intentional interference committed within the scope of corporate authority for the corporation's benefit." *Id.* Namely, corporate officers owe fiduciary obligations to the corporation and "their fidelity . . . aimed toward corporate benefit should not be curtailed by undue fear of personal liability." *Id.*

Considering that (1) Louisiana was "the only American state that [did not] recognize the action for tortious interference with contractual relations," and (2) the basis for an earlier court's proposition that Louisiana does not recognize contractual interference claims was incorrect and conflicted with "the fundamental civil law principle that obliges a person to repair

damage caused another by his fault" (*see Kline v. Eubanks*, 33 So. 211 (La. 1902)), the *9 to 5* Court held that its "<u>previous expressions barring absolutely any action based on a tortious interference with a contract are annulled insofar as they conflict with this opinion</u>." *Id.* at 232-34 (emphasis added).

However, the Court also specifically stated that it did not intend "to adopt whole and undigested the fully expanded common law doctrine of interference with contract . . . ." 538 So. 2d at 234. Accordingly, it specifically recognized only that "an officer of a corporation owes an obligation to a third person having a contractual relationship with the corporation to refrain from acts <u>intentionally</u> causing the company to breach the contract or to make performance more burdensome . . . <u>unless</u> the officer has reasonable justification for his conduct." *Id.* at 231 (emphasis added).

In *Great Southwest*, an excess insurer sued the primary insurer to recover money expended due to the latter's alleged bad faith failure to properly defend and settle a lawsuit against their common insured. 557 So. 2d at 966 (La. 1990). Specifically, after an individual slipped and fell, he sued the common insured and was awarded sums in excess of the primary policy limits. *Id.* The excess insurer alleged that the sums in excess of the primary policy limits were caused by the primary insurer's failure to settle within policy limits. *Id.* The Louisiana Supreme Court granted writs

to determine if the excess insurer had a private right of action against the primary insurer and/or if the excess insurer could assert the insured's rights against the primary insurer through subrogation. *Id.* at 967. The Court ultimately found that the excess insurer became conventionally and legally subrogated to the insured's rights against the primary insurer. *Id.*

Significantly for our purposes, though, the Court was asked to reverse the appellate court's finding "that a primary insurer does not owe a delictual duty to an excess insurer regarding the defense or settlement of claims against their common insured." 557 So. 2d at 969. The Court stated that to recognize such a duty would be to recognize "something very similar to an action for negligent interference with contract." *Id.* It further stated that, in *9 to 5*, it recognized "the possibility of a narrowly drawn action for *intentional* interference with contractual rights." *Id.* (emphasis in original). However, courts generally do not extend liability when "various forms of negligence have either prevented or rendered more burdensome the performance of a contract," because "while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, contract, or other business planning devices." *Id.* at 970. Thus, courts generally follow the policy against recovery based on negligence and "with a few limited and narrow exceptions, have

refused to cross the bright line that has traditionally marked negligence claims for economic harm as off limits which would require them to substitute a case-by-case adjudication on the issue of proximate cause . . . ." *Id.* Rather, the Court suggested that most cases discussing negligent interference with contract could be better understood "by reference to other legal principles," such as subrogation or the "general inhibition in negligence law against compensation for purely economic loss not the result of either bodily harm to the claimant or physical injury to property in which [the] claimant has a proprietary interest." *Id.* at 970-71.

> Considering the foregoing factors and others such as the likelihood that a primary insurer's good faith duty to an excess carrier would evolve to include a duty to avoid negligent interference, the difficulty in reserving the negligent interference action to only excess insurers, the substantial although indirect protection that is already provided insurers legislatively by subrogation, the injustice and inefficiency that may be produced by encouraging insurers with independent rights to intervene in litigious matters in competition with their insureds, and the effect upon insurance administration and rates of requiring primary insurers' attorneys to serve three masters, we conclude that the primary insurer <u>does not owe a duty of care</u> or even of good faith performance to the excess insurer of its insured.

*Id.* at 971 (emphasis added).

In *Wiltz*, after a pesticide "decimated" the farm-raised crawfish crop, buyers and processors of farm-raised crawfish sued the pesticide manufacturer for their alleged economic losses under the Louisiana Products Liability Act ("LPLA"). 645 F.3d at 692

21

(5th Cir. 2011). On motions for summary judgment, the manufacturer argued that the claims were barred by the economic-loss rule, which is based on *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927) and "bars recovery in tort when a party suffers economic loss unaccompanied by harm to his own person or property." *Id.* at 694-95.

According to the Fifth Circuit, Louisiana "adopted a slightly modified version of the economic-loss rule in *PPG*," the case that Plaintiff suggests stands for the proposition that negligent interference with contract claims are not barred per se. 645 F.3d at 697. The Louisiana Supreme Court in *PPG* conducted a duty-risk analysis and "left the door open for case-by-case adjustments" to the economic-loss rule, "emphasized that policy considerations determine the 'reach' of the rule," and instructed courts to examine the "ease of association" between the conduct, risk of injury, and loss and to "consider the particular case in the terms of the moral, social and economic values involved, as well as with a view toward the ideal of justice." *Id.* at 698 (citing *PPG*, 447 So. 2d at 1061). The plaintiffs in *Wiltz* attempted to distinguish *PPG*. *Id.* at 699. Relevant here, they argued that they did not have an enforceable contract to buy crawfish, so they should be permitted to recover in tort. *Id.* at 700. However, the Fifth Circuit reasoned that "by not negotiating [supply] contracts, the plaintiffs would appear to have made a choice to bear the risk of

a supply disruption" and "*PPG* held that not even a binding, contractual right to buy a third party's property was sufficient to create an ease of association between negligent damage to that property and the plaintiff's resulting economic loss." *Id.* (citing *Roberts v. Benoit*, 605 So. 2d 1032, 1056 (La. 1991), *on reh'g* (May 28, 1992)). The Fifth Circuit stated that the finding in *PPG* was "consistent with the Louisiana courts' refusal to recognize a cause of action for negligent interference with contractual relations." *Id.* at 701 (citing *PPG*, 447 So. 2d at 1060 n.1; *Carter*, 607 So.2d at 7; *Great Sw.*, 557 So. 2d at 969-70) (emphasis added). Ultimately, the Fifth Circuit affirmed the district court's grant of summary judgment against the plaintiffs after conducting a duty-risk analysis and applying *PPG*. *Id.* at 702-03.

Notably, a factually identical case was proceeding in the state courts (the *Phillips* litigation) at the same time the Fifth Circuit was considering *Wiltz*. 645 F.3d at 693. In *Phillips*, a jury found the manufacturer liable, but a five-judge panel of the Louisiana Third Circuit reversed, reasoning that the plaintiffs "failed to prove a proprietary interest in the crawfish crop . . . ." *Id.* (citing *Phillips v. G & H Seed Co.*, 08-934 (La. App. 3 Cir. 4/8/09); 10 So. 3d 339, *writ denied,* 09-1504 (La. 10/30/09); 21 So. 3d 284). The trial court then granted summary judgment based on the panel's decision and the plaintiffs appealed, arguing that the trial court "should have used a multi-factor 'duty-risk'

analysis to determine the scope of [the manufacturer's] duty of care." *Id.* at 694 (citing *Phillips v. G & H Seed Co.*, 10-1405 (La. App. 3 Cir. 5/11/11); 66 So. 3d 507, *writ granted, cause remanded,* 11-1861 (La. 11/18/11); 75 So. 3d 460). On May 11, 2011, a three-judge panel of the Louisiana Third Circuit agreed with the plaintiffs and accordingly remanded "to apply 'a multi-factor, policy driven, duty-risk analysis' to determine 'the scope and extent'" of the manufacturer's duties. *Id.*

The *Wiltz* decision was rendered on June 28, 2011, so the Fifth Circuit did not have the opportunity to analyze the subsequent progression of the related state suit. However, after the three-judge panel's decision, on November 18, 2011, the Louisiana Supreme Court granted writs and remanded for a hearing en banc. *Phillips v. G & H Seed Co.*, 11-1861 (La. 11/18/11); 75 So. 3d 460. On remand, the Third Circuit reviewed the jurisprudence and determined that it "indicates that the *per se* exclusionary/proprietary interest rule illustrated in *Robins Dry Dock* is not the law of this state. Rather, a duty-risk analysis was adopted by the Louisiana Supreme Court in *PPG*." *Phillips v. G & H Seed Co.*, 10-1405, p. 10 (La. App. 3 Cir. 3/7/12); 86 So. 3d 773, 780, *writ granted,* 12-775 (La. 6/22/12); 90 So. 3d 447.

Based on this case law, it is unclear whether or not the Louisiana Supreme Court considers negligent interference with contract claims barred per se or if it requires courts to consider

such claims on a case-by-case basis under the duty/risk framework. The holding in *9 to 5* annulling earlier cases that absolutely barred tortious interference with contract claims "insofar as they conflict with this opinion," could mean either that such claims are not absolutely barred or merely that no claims of <u>intentional</u> interference <u>by a corporate officer</u> are so barred. The language from *Great Southwest*, characterizing *9 to 5* as recognizing "the possibility of a narrowly drawn action for *intentional* interference with contractual rights," suggests that the latter interpretation is more likely. Yet, the Louisiana Supreme Court, in *PPG*, *9 to 5*, and *Great Southwest*, appeared to undertake a duty/risk analysis, focusing on the duty and/or scope of the duty elements. For example, the *Great Southwest* Court did not conclude that a negligent interference with contract claim by an excess insurer against a primary insurer is absolutely barred, but that the primary insurer <u>did not owe a duty of care</u> to the excess insurer. 557 So. 2d at 971. Plus, the Fifth Circuit in *Wiltz* and the Louisiana Third Circuit in the *Phillips* litigation either conducted or mandated a duty/risk analysis before reaching a conclusion as to Louisiana's approach to the economic-loss rule.

The relationship between the economic-loss rule and the existence of a claim for negligent interference with contracts is not clear. In *Wiltz*, the Fifth Circuit recognized that it had previously noted that *Robins Dry Dock* "may be read as both denying

recovery for economic loss resulting from physical damage to the property of another, and also denying recovery for negligent interference with contractual rights." *Wiltz*, 645 F.3d at 696 (citations omitted). It appears to this Court that the economic-loss rule is, at the very least, one of several reasons why Louisiana courts hesitate to recognize a claim for negligent interference with contracts. *See Great Sw.*, 557 So.2d at 970 (noting that courts do not generally recognize negligent interference with contract claims because "while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, contract, or other business planning devices"); *Wiltz*, 645 F.3d at 695 (where the Fifth Circuit recognized the economic-loss rule "as a pragmatic limitation on both proximate causation and the scope of a defendant's duty of care"); *Roberts*, 605 So. 2d at 1052, 1056 (noting that *PPG* may be understood as a limitation on "legal or proximate cause," sometimes referred to as the "scope of the duty inquiry"). In cases involving motions based on the economic-loss rule, Louisiana courts and federal courts applying Louisiana law have recognized the need to conduct a duty/risk analysis. *See PPG*, 447 So. 2d at 1059-60; *Phillips*, 86 So. 3d at 780-82; *Wiltz* 645 F.3d at 697-99.

Based on Fifth Circuit and Louisiana Supreme Court precedent, this Court finds that article 2315 and the Louisiana Supreme Court would require a duty/risk analysis before finding that Plaintiff's claim for negligent interference with contract is barred. However, this does not mean that Plaintiff is likely to succeed on such a claim. The Louisiana case law overwhelmingly suggests that this claim is not viable. The Court's decision today merely recognizes the prudence in allowing the parties to brief the issue pursuant to the duty/risk framework. If Plaintiff maintains his claim for negligent interference, Defendant is expected to file an appropriate motion for summary judgment and the Court imagines that its analysis will focus primarily, if not exclusively, on the duty and scope of the duty elements and relevant case law.

## IV. CONCLUSION

For the reasons outlined above,

**IT IS ORDERED** that Defendant's motion to dismiss (Rec. Doc. 12) is **DENIED.**

New Orleans, Louisiana, this 2nd day of August, 2017.

_____

SENIOR UNITED STATES DISTRICT JUDGE